UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FILED BY_____SM_____D.C.

Jul 25, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

CASE NO. <u>25-MJ-6462-PAB</u>

UNITED STATES OF AMERICA

v.

SHLOMO HAIM AKUKA,

     Defendant.
_____/

<u>CRIMINAL COVER SHEET</u>

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

    Respectfully submitted,

    HAYDEN P. O'BYRNE
    UNITED STATES ATTORNEY

By:    *James M. Ustynoski*
    Assistant United States Attorney
    Court Number A5502615
    500 E. Broward Blvd
    Ft. Lauderdale, Florida 33394
    Tel: (305) 954-660-5697
    Fax: (305) 536-4651
    James.ustynoski@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America )<br>v. )<br> )<br>Shlomo Haim Akuka, )<br> )<br> ) | Case No.  25-mj-6462-PAB |

FILED BY_____ *SM* ____D.C.

*Jul 25, 2025*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. -  FTL

_____
Defendant(s)

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    June 10, 2025 to July 25, 2025    in the county of    Broward    in the

Southern    District of    Florida    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(a)(3)<br>18 U.S.C. § 1956(h) | Money Laundering and Money Laundering Conspiracy |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Alonzo Palomares, Special Agent (FBI)
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  Face Time

Date:    07/25/2025

_____
*Judge's signature*

City and state:    Ft. Lauderdale, Florida

Honorable Panayotta Augustin-Birch, United States Magisrate Judge
*Printed name and title*

| Print | Save As... | Attach | | Reset |
|---|---|---|---|---|

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Alonzo Palomares, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have served in this capacity since January 2016.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request an arrest warrant. I am presently a member of the FBI Miami Division Transnational Organized Crime Squad. My duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of federal laws, particularly those found in Title 18 and Title 21 of the United States Code (U.S.C.).  I have participated in investigations which have resulted in the arrests, searches, and seizures of individuals and property.  During my career with the FBI, I have used cooperating informants, undercover agents, pen register/trap and trace devices, video surveillance, wiretaps, GPS tracking devices, search warrants, and audio surveillance, among other law enforcement techniques.  Based on my training and experience, I am familiar with methods used by criminals to further their criminal activities. I also have experience with violent crime and white-collar investigations. Prior to working as an FBI Special Agent, I was an auditor for a public accounting firm and was a Certified Public Accountant (CPA).

2.      Based on the facts set forth in this affidavit, there is probable cause to believe that Shlomo Haim Akuka ("AKUKA") committed violations of Title 18, United States Code 1956(a)(3) and 1956(h) (money laundering and conspiracy to commit money laundering).

3.      The statements contained in this affidavit are based on my personal knowledge, as well as information relayed to me by other law enforcement officials and confidential informants involved in this investigation. I have not included in this affidavit each and every fact known to

1

me.  Rather, I have included only the facts that are sufficient to establish probable cause for the issuance of a criminal complaint against AKUKA for the above-described criminal violations.

## Background on Cryptocurrency

4.      Based upon my training and experience, I know that cryptocurrency (also known as digital currency) is an electronically sourced unit of value that can be purchased with, sold for, or used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Individuals can acquire cryptocurrency through exchanges (i.e., websites) that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies. Individuals can send and receive cryptocurrencies through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on many types of computers, including laptop computers and smart phones.

5.      A "stablecoin" is a type of cryptocurrency where the value of the digital asset is pegged to, or backed by, another asset, such as fiat currency.  USDT, also known as Tether, is a prominent stablecoin which strives to maintain a stable value pegged to the U.S. Dollar.  Receiving USDT is often functionally equivalent to receiving U.S. Currency.

6.      Cryptocurrency can be stored in a digital "wallet," which essentially stores the access code that allows an individual to conduct cryptocurrency transactions.  To conduct transactions, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to a traditional bank account number, while the private key is like the password or PIN used to access that bank account.  Exchangers and users of cryptocurrency often store, and transact with, these cryptocurrencies in several ways, including

2

through mobile and online wallets.  Mobile and online wallets are electronic in nature and can be stored on mobile devices, such as smart phones, or websites that users can access via a computer, smart phone, or any device that can search the internet.  Users of cryptocurrency can download a digital wallet application onto their smart phone.  A user typically accesses the wallet application through inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via these applications.

7.       Cryptocurrency provides its users with pseudo anonymity, which makes transactions more difficult, but not impossible, to attribute to a specific individual.  Unlike a bank wire transfer, a cryptocurrency transaction does not capture the name or address associated with the sender or beneficiary.  Instead, transactions are linked to a unique alphanumeric wallet, which can provide a significant level of privacy, depending on the type of cryptocurrency and wallet utilized.  Based on my training and experience, I know that criminals often utilize cryptocurrency to transfer money because it is more difficult for law enforcement to trace the origin or ultimate destination of the funds and determine the identities of the owners of cryptocurrency wallets.

**PROBABLE CAUSE**

8.       In January 2025, two FBI Confidential Human Sources ("CHS 1" and "CHS 2," collectively, the "CHSs") began identifying suspected money launderers operating in South Florida.  The initial investigation focused on criminal organizations suspected of engaging in money laundering and primarily based in Orlando (with a South Florida presence) but shifted to investigating suspected money launderers in Miami.  In June 2025, a mutual contact and suspected associate of the Brazilian criminal organization coordinated a meeting between the CHSs and AKUKA.

9.       Prior to meeting with suspected money launderers, FBI Miami agents instructed the

3

CHSs to attempt to make it known to the targets of the investigation that the CHSs were in possession of U.S. Currency derived from illicit activities, such as narcotics trafficking, which they wished to convert into another asset. The U.S. Currency was FBI owned money. The CHSs were instructed to request cryptocurrency from the suspected money launderers and have it sent to an FBI owned wallet. The meetings referenced below were audio and video recorded.

10.     On June 10, 2025, the CHSs first met with AKUKA at a restaurant in Hollywood, Florida to make initial introductions and discuss the terms of the planned monetary transactions. An unidentified male and associate of AKUKA was also present. The conversations between the CHSs and AKUKA occurred in Spanish. The CHSs told AKUKA they were in possession of U.S. Currency and wanted to convert it to cryptocurrency, starting with a "small" $30,000 transaction and increasing the amounts in future meetings. When AKUKA asked the CHSs about the nature of businesses they operated, the CHSs responded that "they did not like to talk about that" because they were just getting acquainted. AKUKA responded that the "now understands everything." AKUKA later said in the meeting that things were "very hot" and that he needed to be "careful," such as when communicating by telephone. Based on my training and experience, I understood that AKUKA meant that law enforcement activity was high when referring to things being "very hot." AKUKA also said he was a professional and that his organization had bank accounts at several large institutions, which were all affiliated with businesses and could provide invoices, if the CHSs needed to engage in banking transactions. AKUKA said his organization has offices throughout the U.S. and the world.

11.     Immediately following the restaurant meeting, the AKUKA and the CHSs travelled to an office located at 221 W. Hallandale Boulevard, Hallandale Beach, Florida. The CHSs provided AKUKA with $30,000 of U.S. Currency and agreed to pay a 5% fee (or $1,500) to convert the fiat

currency to cryptocurrency.  AKUKA verified the amount by running the bills through a money counter.  The CHSs provided AKUKA with the address of a government owned cryptocurrency wallet.  On June 10, 2025, 28,500 USDT were sent to the government owned cryptocurrency wallet.

12.     Based on my training and experience, AKUKA understood that he was engaging in laundering illicit funds and therefore charged the CHSs a 5% fee to "clean" the money and make it appear to have legal origins.

13.     On June 13, 2025, the CHSs met with AKUKA at an office building located at 3440 Hollywood Boulevard, Hollywood, Florida.  The CHSs and AKUKA went to the 4th floor of the building and walked into a business space believed to be leased or owned by an unindicted co-conspirator herein referred to as Individual 1.  Individual 1 is a U.S. Citizen who speaks English and some Spanish.  The CHSs told AKUKA that they brought him $55,000 of U.S. Currency, which was verified by an unknown person running the bills through a money counter.

14.     During the meeting, AKUKA, the CHSs, and Individual 1 were all present in an office together.  AKUKA asked CHS 1 in Spanish if he "worked with H," referring to Heroin, and when CHS 1 asked why, AKUKA said that he had a problem with a particular person and group that worked with "H."  CHS 1 responded to AKUKA that he worked with "coca," referring to cocaine and not with "H."  Individual 1 then followed up by asking CHS 1 in English, "You have a connection to cocaine? You do or you don't… Me too."  AKUKA asked CHS 1 if he knew of the person AKUKA had problems with.  CHS 1 responded, "No" and that he was "getting to know him (AKUKA)."  CHS 1 told AKUKA that "he moved a lot of money on a weekly basis" and "sold a lot of kilos on a weekly basis."

15.     During the meeting, Individual 1 was in possession of personal use cocaine and, while in the presence of AKUKA, offered some cocaine for CHS 1 to use.  Individual 1 said, "I'm going to

do a blast of cocaine." CHS 1 declined.

16.     During a delay in processing the cryptocurrency transaction, CHS 1 asked AKUKA if there is a problem with bringing a larger amount of currency. AKUKA responded, "No" and that for security purposes, his organization required double authentication, and that one code is sent to AKUKA, and the other sent to his associate. AKUKA then added that he was able to exchange much larger amounts of U.S. Currency, including up to $1 million, so long as he received sufficient notice.

17.     The CHSs and AKUKA were only able to partially complete the $55,000 transaction on June 13, 2025, due to problems that AKUKA had with obtaining the second authentication code for the transaction. Instead, AKUKA sent approximately 14,450 USDT to the FBI controlled cryptocurrency wallet and returned $40,035 in cash to the CHSs, which was later counted by FBI agents.

18.     On June 17, 2025, the CHSs again met with AKUKA and completed the $55,000 transaction. The CHSs returned the $40,035 to AKUKA, who sent approximately 37,800 USDT to the FBI controlled wallet. In total, approximately 52,250 USDT was sent to the FBI controlled wallet, which represented that a 5% laundering fee was paid to AKUKA.

19.     During the June 17th meeting, AKUKA asked CHS 1 in Spanish if he needed more clients to sell "flour" to, which I believe in my training and experience was a reference to cocaine.

20.     On June 18, 2025, AKUKA and the CHSs met to exchange U.S. Currency for cryptocurrency. The CHSs provided $50,000 in exchange for 46,000 USDT, which represented that an 8% fee was paid to AKUKA. Your Affiant believes that AKUKA requested a higher fee because he was knowing laundering money for someone he believed was a cocaine trafficker.

21.     On July 17, 2025, AKUKA and the CHSs met to exchange U.S. Currency for cryptocurrency. The CHSs provided $100,000 in exchange for approximately 92,000 USDT, which

represented that an 8% fee was paid to AKUKA.[1]

22.     On July 23, 2025, AKUKA and the CHSs met to exchange U.S. Currency for cryptocurrency.  The CHSs provided an associate of AKUKA $45,000 in exchange for 40,000 USDT and a return of $1,800 in cash, which represented an approximately 7% fee paid to AKUKA.

**SOLICITATION TO KIDNAP AND COMMIT VIOLENCE**

23.     On July 17, 2025, while waiting for a cryptocurrency transaction to process, AKUKA told both CHS 1 and CHS 2 that he needed help with an issue.  AKUKA said that there was a Brazilian man ("VICTIM 1") who owed him $3 million worth of cryptocurrency.  AKUKA wanted to know if the CHSs could help with kidnapping VICTIM 1, VICTIM 1's fiancé, and/or his daughters (collectively, the "Victims") to force him to pay the debt owed.  AKUKA said that he previously attempted to hire a separate crew to conduct the kidnapping, but that they made no agreement because that crew wanted 50% of the debt owed to do the job.  AKUKA told the CHSs that he was tracking the fiancé's car through a mobile application and a GPS tracker placed on her car.  AKUKA showed the CHSs the fiancé's Instagram page.  AKUKA told the CHSs that he would pay them 20% of the $3 million to carry out the kidnapping.  AKUKA said that during the kidnapping that the hands of VICTIM 1's minor daughter should be cut off until VICTIM 1 paid the debt to AKUKA.

24.     On July 23, 2025, AKUKA met with the CHSs and two undercover (UC) law enforcement officers.  AKUKA was told by the CHSs that the UCs worked for the CHSs.  AKUKA again reiterated the story about being owed $3 million by VICTIM 1 and that he wanted VICTIM 1 and/or his family kidnapped to force payment of the debt.  AKUKA also told the UCs that they were

---

[1] Due to a delay in processing part of the cryptocurrency transaction, AKUKA returned $5,600 of U.S. Currency to the CHSs because the CHSs were not provided a full payment.  However, the remaining cryptocurrency was received by the FBI wallet later that evening, resulting in a net overpayment by AKUKA.  On July 18, 2025, the CHSs met with AKUKA to return the $5,600 to AKUKA.  The net result was $100,000 exchanged for approximately 92,000 USDT, representing an 8% fee paid to AKUKA.

tracking the fiancé's car, in addition to VICTIM 1's vehicle. AKUKA said that he could provide the GPS tracking information and identifying information to the UCs to carry out the kidnapping. AKUKA said that the UCs could kidnap VICTIM 1 and cut off his fingers to force payment. However, AKUKA believed that kidnapping VICTIM 1's daughters would be easier and was willing to have their fingers cut off as well. During this meeting, the UCs requested an upfront payment from AKUKA to carry out the kidnapping and AKUKA said he was willing to pay $10,000.

25.     Based on my training and experience, I believe that AKUKA asked the CHSs for assistance in this violent plot because he believed that the CHSs were criminals involved in narcotics trafficking who could carry out the plot or knew individuals who could do so.

## **CONCLUSION**

26.     Based on the aforementioned facts, I respectfully submit that there is probable cause to believe that Shlomo Haim Akuka committed violations of Title 18, United States Code, Section 1956(a)(3) and 1956(h) (money laundering and conspiracy to commit money laundering).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

_____
SPECIAL AGENT ALONZO PALOMARES
FEDERAL BUREAU OF INVESTIGATION


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime on this 25th day of July 2025.

_____
PANAYOTTA AUGUSTIN-BIRCH
UNITED STATES MAGISTRATE JUDGE